```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT


  UNITED STATES OF AMERICA     :
                               :
       v.                      :
                               : Crim. No. 3:94-cr-00223 (AWT)
                               :
  JORGE RIVERA                 :
```

## ORDER DENYING MOTION FOR SENTENCE REDUCTION
## UNDER THE FIRST STEP ACT

Defendant Jorge Rivera has moved for a sentence reduction under Section 404 of the First Step Act, based on application of the Fair Sentencing Act of 2010, and Section 603 of the First Step Act, commonly referred to as "compassionate release." For the reasons set forth below, his Motion for Reduction of Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and Sections 404 and 603 of the First Step Act (ECF Nos. 2647, 2652, 2667) is hereby DENIED.

I

In July 1996, Jorge Rivera, who was the President of the Los Solidos gang, was convicted on 27 counts of a Third Superseding Indictment following a three-month trial. The counts of conviction are as follows:

> Counts 1 and 2: Racketeering in Corrupt Organizations
> (RICO) (18 U.S.C. § 1962(c)) and RICO Conspiracy (18 U.S.C.
> 1962(d));

Count 3: Violent Crime in Aid of Racketeering (VCAR) – Conspiracy to Murder Latin Kings, in violation of 18 U.S.C. § 1959(a)(5);

Count 4: VCAR Murder of Marcelina Delgado, in violation of 18 U.S.C. § 1959(a)(1);

Counts 5 and 6: VCAR Attempted Murder and VCAR Assault of Angel Delgado, in violation of 18 U.S.C. §§ 2, 1959(a)(3) and (a)(5);

Counts 8-11: VCAR Conspiracy to Murder Angel Serrano I, VCAR Attempted Murder of Angel Serrano, VCAR Conspiracy to Murder Latin Kings and Associates, and VCAR Murder of Angel Serrano, in violation of 18 U.S.C. §§ 2, 1959(a)(1) and (a)(5);

Counts 14 and 15: VCAR Murder of Michael Diaz and George Hall, in violation of 18 U.S.C. §§ 2 and 1959(a)(1);

Counts 16-20: VCAR Conspiracy to Kidnap/Assault Jaime Baez, VCAR Kidnapping of Jaime Baez, VCAR Assault of Jaime Baez, Conspiracy to Possess with Intent to Distribute Stolen Cocaine I and II, in violation of 18 U.S.C. §§ 2, 1959(a)(1), (a)(3), (a)(5), and 21 U.S.C. § 846;

Count 28: Conspiracy to Threaten to Commit a Crime of Violence against Harry Torres, in violation of 18 U.S.C. § 371;

Counts 32-35: Conspiracy to Possess with Intent to Distribute cocaine base, cocaine, heroin, and marijuana, involving the Lawrence Street Drug Conspiracy, the Charter Oak Drug Conspiracy, the Hudson Street Drug Conspiracy, and the Stowe Village Drug Conspiracy, in violation of 21 U.S.C. § 846;

Count 37: Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1);

Count 38: Possession of Firearm with Obliterated Serial Number, in violation of 18 U.S.C. § 922(k);

Counts 41-43: Bribery of Steven Hagerty, in violation of 18 U.S.C. § 201(b)(1).

Rivera was subsequently charged in a Fifth Superseding Indictment, under the same criminal case number, and on March 31, 1997 he was convicted on the following counts:

> Count 7: Aiding and abetting interstate travel to commit a crime of violence (arson), in violation of 18 U.S.C. §§ 2 and 1952(a)(2), in connection with the unsuccessful arson of a home in Massachusetts on May 20, 1993.
>
> Counts 6 and 8: Conspiracy to travel interstate to commit a crime of violence (arson), in violation of 18 U.S.C. §§ 371 and 1952(a)(2), and aiding and abetting interstate travel to commit a crime of violence (arson), in violation of 18 U.S.C. §§ 2 and 1952(a)(2), in connection with the successful arson of the same Massachusetts home on May 29, 1993.

On November 19, 1996, Rivera was sentenced to concurrent terms on the convictions in the Third Superseding Indictment, as follows:

> Life – Counts 1 and 2 (RICO and RICO Conspiracy); Count 4 (VCAR: Murder of Marcelina Delgado); Count 11 (VCAR: Murder of Angel Serrano); Counts 14 and 15 (VCAR: Murder of Michael Diaz and George Hall); Count 17 (VCAR Kidnapping: Jaime Baez);
>
> Life – Counts 19 and 20 (Conspiracy to Possess with Intent to Distribute Stolen Cocaine I and II); Counts 32-35 (Conspiracy to Possess with Intent to Distribute cocaine base, cocaine, heroin, and marijuana);
>
> 240 months – Count 6 (VCAR: Angel Delgado Assault); Count 18 (VCAR: Jaime Baez Assault);
>
> 180 months – Counts 41-43 (Bribery of Steven Hagerty);
>
> 120 months – Count 3 (VCAR: Conspiracy to Murder Latin Kings); Count 5 (VCAR: Attempted Murder of Angel Delgado); Counts 8-10 (VCAR: Conspiracy to Murder Angel Serrano I, VCAR: Attempted Murder of Angel Serrano, VCAR: Conspiracy to Murder Latin Kings and Associates); Count 16 (VCAR

3

 Conspiracy: Jaime Baez); Count 37 (Felon in Possession of a Firearm);

 60 months – Count 28 (Conspiracy to Threaten to Commit a Crime of Violence against Harry Torres); Count 38 (Possession of Firearm with Obliterated Serial Number).

 On May 31, 1997, Rivera was sentenced on the Fifth Superseding Indictment to 48 months on Count 6 and 60 months on Counts 7 and 8, to run consecutively to each other, but concurrent to the sentences imposed on November 19, 1996.

 With respect to the 1996 RICO trial, the facts with respect to the defendant's offense conduct are set forth in the 58-page Exhibit 1 (ECF No. 2671-1) to the Government's Opposition to Defendant's Motion for Resentencing Under the First Step Act ("Government's Opposition") (ECF No. 2671), and with respect to the 1997 travel arson trial, in the 10-page Exhibit 2 (ECF No. 2671-2) to the Government's Opposition. In addition, in the Government's Opposition there is a succinct summary of the leadership structure the Los Solidos gang and the defendant's role as its president, as well as the gang-sanctioned narcotics dealing overseen by Rivera, see Gov't's Opp'n at 4-5, the gang-sanctioned robberies overseen by Rivera, see id. at 5-6, the retaliatory murders committed by Los Solidios members who were following Rivera's directives, i.e. George Hall, Micheal Diaz, Angel Serrano, and Marcelina Delgado, see id. at 6-9, and the

May 1993 unsuccessful and successful arsons committed pursuant to Rivera's directives, see id. at 9-10.[1]

Particularly noteworthy for purposes of the instant motion with respect to the murders is that they followed "Rivera order[ing] a 'green light' on the Latin Kings. A green light was a standing order to shoot and kill any Latin Kings without further authorization. Rivera's 'green light' ignited an all-out war between Los Solidos and the Latin Kings." Gov't's Opp'n at 6-7. Also, "Rivera became dissatisfied with the pace of the revenge and ordered that the Solidos commit 'missions' (murders and attempted murders) against the Latin Kings over Thanksgiving 1993." Id. at 7. "All of Rivera's directives and orders were designed to instigate members of Los Solidos to kill members of the rival Latin Kings." Id. "In response to that order, three murders were carried out over the Thanksgiving weekend." Id. In addition, when the government writes that the fourth murder, "[t]he killing of Marcelina Delgado remains one of the most notorious events in recent Hartford history", it is not engaging in hyperbole. Id. at 1. The government accurately describes that she "was killed in a drive-by shooting while she slept in the backseat of a car mistaken for one driven by a member of the

---

[1] The page numbers cited to in this order for documents that have been electronically filed refer to the page numbers in the header of the documents and not to the page numbers in the original documents, if any.

5

rival Latin Kings gang." Id. The government accurately summarizes the circumstances surrounding that murder as follows:

> However, they were mistaken in their identification of this car and its occupants. The vehicle did not contain any Latin King members. Instead, the car was being operated by Angel Delgado who was driving his wife and three daughters to his mother's house to deliver groceries. Mr. Delgado – a garage mechanic and not a gang member – was shot in the back and seriously wounded. His seven year old daughter, Marcelina Delgado, was shot once in the head as she slept in the back seat of the car. Marcelina Delgado died as a result of that gun shot to her head.

Id. at 8-9.

Particularly noteworthy for purposes of the instant motion with respect to the arson offenses is that they followed a request by Lawrence Beauvais, the Los Solidos' "Godfather," to "the leadership of Los Solidos to take care of a problem a fellow inmate was having with a Department of Corrections employee." Id. at 9. There was an unsuccessful attempt to burn down the home of the home of the Department of Corrections employee on May 19, 1993. Then there was a follow-up attempt on May 29, 1993, which the government accurately describes as follows:

> Upon the Superiors return, they told the Solido arsonists that the mission had not been completed and they needed to finish the job. In the early morning hours of May 29, 1993, Solidos members returned to Springfield to complete the mission. This time, they prepared "Molotov cocktails", which they ignited and threw through the corrections employee's residence front window. This time, the incendiary devices worked as designed, setting the residence ablaze. At the time the fire was set, sleeping in the house were the employee, her husband and their three

6

year old child. Fortunately, they were able to escape the inferno. Unfortunately, the residence was destroyed and the family – which was renting the residence and had no insurance – was forced into bankruptcy.

Id. at 9-10.

## II

Under Section 404 of the First Step Act, "[a] court that imposed a sentence for a covered offense may, on motion of the defendant, the Director of the Bureau of Prisons, the attorney for the Government, or the court, impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 . . . were in effect at the time the covered offense was committed." First Step Act of 2018, Pub. L. No. 115-391, § 404(b), 132 Stat. at 5222.

Also, the First Step Act amended, inter alia, Section 3582(c)(1)(A) of Title 18 of the United States Code. That provision requires as an initial matter that

> the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . .

18 U.S.C. § 3582(c)(1)(A). Assuming a defendant has exhausted administrative remedies, a court may reduce a term of imprisonment under Section 3582(c)(1)(A)(i) if, after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable, the court finds that "extraordinary

7

and compelling reasons warrant such a reduction" and "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission". 18 U.S.C. § 3582(c)(1)(A)(i).  In making this determination courts should "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release.  Neither Application Note 1(D), nor anything else in the now-outdated version of Guidelines § 1B1.13, limits the district court's discretion." United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020).

Rivera has satisfied the requirement with respect to exhaustion of administrative remedies.

### III

Rivera contends that extraordinary and compelling reasons support a reduction of his sentence. He states that he has a history of complex trauma in that he suffered extreme poverty and housing neglect as a child; the educational system failed him by passing him each year despite obvious, undiagnosed learning disabilities and severe truancy; and his unaddressed childhood trauma impacted his behavior and development. He states that "Los Solidos provided a 'family' structure and support system with male role models that Mr. Rivera lacked." Def.'s Mem. (ECF No. 2667) at 32.

Rivera submits a report from a licensed clinical psychologist, Nakia M. Hamlett, Ph.D., to whom he was referred for a biopsychosocial assessment. The report contains certain suggestions as to things Dr. Hamlett thinks may be helpful to Rivera, namely, psychotherapy, psychiatric medication evaluation and management, vocational, educational, and mental-heath oriented classes and education, and psychological testing. The report states that "[a]lthough, individual choice and decision-making always plays a central role, unfortunately, in dire circumstances, many individuals lack the internal or external means to avoid poor decision-making, avoid danger, or 'pull themselves' out of worsening trajectories." Def.'s Mem., Ex. D (ECF No. 2649) at 13.  However, except with respect to the convictions for drug offenses, nothing in the report suggests a nexus between "dire circumstances" and his conviction of the offenses for which he is serving multiple life sentences.

Rivera states that he has taken significant steps in terms of rehabilitation and that he aspires to work with at-risk youth in gang violence intervention. He has submitted a personal statement in which he explains the circumstances of his upbringing and how he came to associate with members of Los Solidos. He also acknowledges the harmful effects of his offense conduct. See Def.'s Mem., Ex. C (ECF No. 2647-3) at 4 ("I now realize the hurt, pain, and sufferings my community has endured

9

at the hands of gang violence after years of reflecting daily while in prison and growing older in age and with maturing of the mind.").

Rivera argues that his sentence has been particularly harsh because of his inability to be supportive of family members when tragedies occurred, and because of the COVID-19 pandemic and the fact that approximately 70-80% of the prisoners at USP Tucson, which is a high security penitentiary, are sex offenders. In addition, Rivera argues that "[t]he guidelines have drastically changed since Mr. Rivera was sentenced." Def.'s Mem. at 40 (italics omitted). Finally, using statistics from the United States Sentencing Commission, Rivera argues that his life-sentence is unusually long.

In a reply brief, Rivera states that:

> (1) He has retired from the gang lifestyle; (2) The law allows for the Court to exercise its discretion in resentencing and releasing individuals such as Mr. Rivera; (3) Based on a study completed by the Sentencing Commission, he has a low likelihood of committing a crime upon his release, thereby posing no danger to the community; and (4) During his incarceration Mr. Rivera has used his time to rehabilitate himself.

Def.'s Reply (ECF No. 2699) at 1-2.

With respect to rehabilitation, in addition to letters from relatives and his family, Rivera submits letters from other inmates who attest to the positive impact he has had on them and the changes they see in him. See, e.g., Def.'s Reply, Ex. F (ECF

10

No. 2699-6) at 4, Letter from Matthew Smith ("In prison most still lived that life, so I was amazed at how Jorge, who came from a large gang and was the leader, chose to give it all up and change his life."); id. at 5, Letter from Kyle Kirby ("I have seen Jorge encourage those around him to further their education, get G.E.D.s and obtain vocational trainings when possible. I've been present when he's counseled men to be supportive husbands and involved fathers."); id. at 15 (initial caps added), Letter from Patrik Pan Arsenualt ("Prison is populated by individuals who don't care about the harm they've caused. Jorge is not cut from that cloth."); id. at 16, Letter from Jason Philips ("Mr. Rivera has Become not only A positive influence But Also a Role Model for Change!!").

The Reply Memorandum is also accompanied by follow-up letter from Rivera himself in which he explains "I would love the opportunity to expand my positive energy and influence, to those misled minds beyond these walls. Because, to these minds, they require a 'real voice' from someone who has already lived the destructive path they are heading." Id. at 20, Letter from Jorge Rivera. Rivera also submits numerous certificates of completion for educational and personal development courses as well as athletic achievement awards. See Def.'s Reply, Ex. D (ECF No. 2699-4).

With respect to medical conditions, Rivera emphasizes that he has a condition that places him at greater risk of complication from COVID-19. He maintains that even though he had already contracted COVID-19 and is vaccinated, the prison environment and his medical condition leaves him particularly vulnerable to infection. Dr. Hamlett's conclusion after reviewing his medical records, however, is that according to records, Mr. Rivera does not have major health problems. See Def.'s Mem., Ex. D at 3.

The parties disagree about whether Rivera is eligible for relief under Section 404 of the First Step Act with respect to any counts other than Counts 32, 33, and 34, and also as to whether there are extraordinary and compelling reasons for reducing his sentence under Section 603. The court need not address those issues because, even if they were resolved in the defendant's favor, Rivera's commendable efforts in terms of rehabilitation and the other arguments advanced by him in support of his request for a sentence reduction are decisively outweighed by the need for the sentence in his case to reflect the seriousness of his offense conduct.

With respect to Rivera's efforts in terms of rehabilitation, in the courts view, while they are commendable, they are not extraordinary. For example, while in some instances, extraordinary rehabilitative efforts by an inmate

12

have been given recognition by the Bureau of Prisons in the form of a transfer to a low-security prison, that has not happened in Rivera's case.[2]

After taking note of Rivera's commendable efforts in terms of rehabilitation and the other points he raises, the court must still determine whether a sentence reduction is warranted "after considering the factors set forth in § 3553(a) to the extent they are applicable." 18 U.S.C. § 3582(c)(1)(A). In Rivera's case, the court believes that the most significant Section 3553(a) factor is the purposes of sentencing and that the purpose of sentencing that should be given the greatest weight here is the need for the sentence imposed to reflect the seriousness of the offenses.

In terms of the seriousness of the defendant's offenses, while Rivera is serving a number of life sentences for drug-related offenses, the more significant life sentences for purposes of the instant motion are those imposed for other offenses. As the government asserts, Rivera "seeks a reduction that would significantly reduce a life sentence for the leader of a violent gang who was found guilty of four murders and a

---

[2] See United States v. Cruz, 3:94-CR-112 (JCH), 2021 WL 1326851, at *8 n.7 (D. Conn. Apr. 9, 2021) ("In the court's experience, it is unusual for a defendant convicted of murder to be confined in a low-security prison. . . . That Cruz is confined at a low-security facility is further indication of his rehabilitation.").

wide-range of other serious crimes." Gov't's Opp'n at 34-35. "Rivera was responsible for four murders – two innocent bystanders, 16-year old George Hall and seven year-old Marcelina Delgado, and two members of the rival Latin Kings gang, Angel Serrano and Michael Diaz." Id. at 44. The court agrees with the government's position that "[i]t is difficult to overstate the seriousness of Rivera's offenses, which devastated both the victims' families and the Hartford community at large . . . ." Id. at 44.

Also, while Rivera argues that "[t]here has been a massive transformation in federal sentencing since Mr. Rivera was sentenced in 1996" (Def.'s Mem. at 40), as the government notes, there has not been any such change that is favorable to the defendant with respect to VCAR murder.[3]

Consequently, in the court's view, the goal of having the sentence imposed reflect the seriousness of the offenses

---

[3] See the Government's Opposition:

> As noted, with respect to VCAR murder, Rivera is correct that the landscape has changed, though not in the way that he suggests. When Rivera was charged in 1994, the VCAR statute punished murder (and kidnapping) "by imprisonment for any term of years or for life . . . ." [] On September 13, 1994 – a little over a year after the 1993 Thanksgiving Day murder spree and six months after the killing of Marcelina Delgado -- Congress amended the penalty provision of 18 U.S.C. § 1959(a)(1) to punish an individual convicted of murder "by death or life imprisonment . . . Thus, were Rivera convicted today he would face mandatory life imprisonment or, potentially, the death penalty."

Gov't's Opp'n at 45-46.

14

committed by this defendant would be seriously undermined by reducing his sentence to a sentence of less than life in prison.

It is so ordered.

Signed this 1st day of July 2024 at Hartford, Connecticut.

/s/AWT
Alvin W. Thompson
United States District Judge
